McArdle. Good morning, Your Honors. Lance McArdle for the Appellant's Dr. and Mrs. Carson. The plaintiffs contend that Dr. and Mrs. Carson knowingly misled and knowingly deceived their friends and colleagues, some of whom were practicing with Dr. Carson in a cardiology practice, some of whom are investors with the Carsons in other hotel ventures. We submit that what the plaintiffs are asking the Court to accept is not only illogical, but also that no reasonable jury would conclude that based on the evidence in this case. But the issue today on appeal is whether there are any genuine issues of material fact here. We're here to ask you to give the Carsons their day in court, to allow a jury to hear the evidence, to look the witnesses in the eyes before reaching a decision on the merits of this matter. This is a long and somewhat convoluted case. It was originally filed, the plaintiffs allege, 11 different theories of liability against the Carsons in two limited liability companies, Kapp and Sineth. Now the claims against Kapp and Sineth were adjudicated and affirmed by another panel of this Court in the summer of 2014. Through a series of motions and rulings, all but two of the claims against Dr. and Mrs. Carson have been dismissed. So the first remaining claim is a direct claim against the Carsons for violation of Louisiana securities laws. The second claim is a derivative claim against the Carsons, asking that they be found liable for the debts of Sineth under a piercing of the veil theory. Now the District Court ruled that the Carsons are liable under both theories of liability by way of summary judgment based on the same finding that the Carsons on November 22, 2006, knowingly and that would own the Louisiana Hotel and Convention Center in Alexandria. Now the legal elements behind the two different theories are different, so it's important to consider them separately. But taking the first, the Louisiana securities law claim, the District Court held that there was no genuine issue of material fact that the Carsons made a material misrepresentation to the plaintiffs, that the plaintiffs were unaware of this alleged misrepresentation, but that the these findings were in error, Your Honors. First, the statement that the plaintiffs would be members of an LLC that would own the hotel is not an actual misrepresentation unless it can be proven that the Carsons, when they were making the statement, never intended to perform, never intended for that result to happen, or somehow made the statement without a reasonable basis, knowing that it was impossible. But the District Court in this case, Your Honor, found that the solely because the hotel was never transferred to Sainth, but that finding alone later does not render the statement a misrepresentation when it was made. But even if the statement were deemed to be a misrepresentation, there's a significant amount of evidence in the record that the Carsons did not know that they were making a misrepresentation at the time. Let me ask you that. Now, let's see, at the time this presentation was made, the defendant's LLC, CAP, had an option to buy the hotel, did it not? In effect, an option? Well, they had already executed a purchase agreement to purchase it, and in fact had put a deposit in early November, and they were obligated to close. They were further along than an option. They actually had an agreement to purchase. At least the CAP had an option to purchase, or had an agreement to purchase. That's correct. And so then, with that knowledge, this presentation was made that Sainth would own the hotel, and these plaintiffs would be getting an interest in the hotel through the LLC? Yes, Your Honor. The plaintiffs were told in advance of that meeting and at the meeting that the Carsons had an agreement to buy the hotel. And in fact, the presentation itself says the closing date for the hotel was going to be December 7th or 8th, I think, in the actual presentation. And so they knew that the Carsons were already in line to buy it, and they also knew at that presentation that Sainth hadn't been formed yet, and that they had no investor proceeds. The idea of the presentation was, if you guys want to invest, we're going to form a new LLC, we're going to take your investments, and then the hotel will be transferred over into the new entity. Okay. Then, around that same time, this letter of interest was given to the plaintiffs, was it not? Yes, Your Honor. And in the letter of interest, at the top of it, it says Louisiana Convention Center and Hotel. And they purport to buy, then, the share in that Sainth, which I would think you would read that letter of interest as saying Sainth owns the hotel, or would you? I mean, what were they buying? Well, they were buying—well, the letter of interest, they weren't buying anything at the time they were agreeing to buy, but they were buying an interest in Sainth, which was then their investments. They were treated as owners of Sainth from that moment on. Owners of—they had an interest in Sainth, but Sainth didn't own any interest in the hotel. That's—well, that's correct, Your Honor. The hotel had not yet been transferred, but it was always the intent for the hotel to be transferred. It took two years to do it, though, didn't it? Well, it was never transferred, in fact, Your Honor. Before you even declared to the plaintiffs an intent to transfer it, it took two years. Well, not really, Your Honor. I mean, the document that you're talking about, the letter of intent, and they received a letter of receipt after they paid their proceeds, both of those documents indicated that additional paperwork was yet to be executed and that they even gave the name and number of the attorney who was charged with preparing those documents. What did they get when they got that piece of paper? Did they own anything? From our perspective, they owned shares of Sainth, and it was just a matter of a transfer having to happen before the hotel was transferred. When they made their investments, again, you know, the intent was always for Sainth to own the hotel. This Court—another panel from this Court confirmed that that was undisputed, that the Carsons and the plaintiffs always intended for that to happen. Carsons confirmed that intent in their depositions. The lawyers and accountants in their depositions confirmed that that was their intent. And so— Well, you know, the last panel affirmed the District Court's finding of breach of contract that there's no consideration for the transfer for the money they paid. Between Sainth and the plaintiffs. Yes, Your Honor. Is that right? Yes. So didn't the Court, in effect, hold if the plaintiffs didn't get anything for the money they paid? I don't know if that was the extent of the holding or if it just unwound. What else could it be? Well, I think they rescinded the contract and returned the—and ordered the return of the process. But didn't they—I mean, didn't it essentially—didn't it hold—I mean, is there any doubt the prior panel affirmed, the District Court told me, that they didn't get anything for the money they paid? Well, I think that the holding confirms the fact that Sainth was never transferred—I'm sorry, the hotel was never transferred to Sainth, and because that was a principal cause of the contract, that they didn't get what they wanted. So they breached the—Sainth had—you know, the failure of cause as to the contract between plaintiffs and Sainth. Right. But, you know, I think that in addition to the evidence of their intent to transfer the hotel, the Carsons actually took action to transfer the hotel. They presented the plaintiffs with paperwork to facilitate that transfer. Two years later. Well, it was one year after operations of the hotel, Your Honor, but I mean, some of the plaintiffs didn't invest until into 2007. During this time, they were using the plaintiffs' money to reduce the debt, which the Carsons were on the hook for. Well, the mortgage was on the hotel. The money was used in part to pay the mortgage on the hotel. And the dependents were guarantors of that note on the mortgage. They personally guaranteed the mortgage. That's correct. But, you know, at the end of the day, what I'm saying is that because it was just a matter of the hotel being transferred, it was always going to be owned by Sainth. I mean, there's no logical explanation. I mean, the plaintiffs failed to understand—I mean, failed to articulate what they suggest the Carsons' endgame was. Were we just going to keep them in the dark forever, and if the hotel was a great success, they were going to sell it at a huge profit and cut out their friends and colleagues? It just doesn't make any sense. I agree. I think everybody wished that things would have been done sooner than they were, or that issues would have been raised earlier. That meeting that they had with the investors was after the very first full year of operations. The hotel opened in July 2007, and in July 2008, they had a presentation. They went over the past year performance. They went over what was going to happen next year, et cetera. And it was at that meeting, after a somewhat lackluster performance discussion of the former year, that one of the plaintiffs says he didn't understand the investment, didn't want to sign the documents, and then other plaintiffs kind of followed suit. When the documents were presented, weren't the plaintiffs asked to guarantee them the note on the mortgage? No. No. It was just merely that the mortgage was going to be transferred from Cap to Sainth, but the personal guarantees of the Carsons and all that was still going to remain the same. The plaintiffs were never obligated for anything beyond their initial capital investment. But the mortgage encumbered the property. Yes, Your Honor. But that was known at all times. The presentation itself back in November of 2006 made clear that there was going to be a mortgage and that there was going to be debt on the property, that they had pro formas, that they were going to pay $500,000 in interest a year for the first five years of operations. I thought when you said the plaintiffs were never obligated, I thought that Mrs. Carson was claiming she gets management fees from Sainth. There were some... $15,000. There was some discussion of that initially. Ms. Carson was never paid any management fees, but that... That's a claim she has against Sainth? I think that was a claim that was raised at one time, but that does not implicate the plaintiffs to any personal liability beyond the capital invested in Sainth. Let me... I'll skip to the piercing of the veil theory as well, Your Honor. This claim is before the court for the second time. On December 20th, 2011, the district court ruled that the Carsons were liable for the jurisprudential factors in Riggins v. Dixie-Shoring. On appeal, the other panel from this court vacated and remanded and asked the court to reconsider in light of a new Louisiana Supreme Court case, Ogier v. Merritt, which discussed piercing in the context of the LLC statute. On remand, the district court issued a revised ruling, again finding the Carsons liable for the debts of Sainth, but for two reasons. First, it found that the Carsons did commit fraud, and then secondly, that its initial analysis under the traditional corporate veil piercing factors was still valid. And these findings, Your Honors, were also in error. First of all, to find that the Carsons committed fraud, that again would have required a finding that the statement was a misrepresentation at the time that it was made, on November 22nd, 2006. But more importantly, that requires a finding of their intent, of their mental state, which is pretty well established that findings of mental state or intent by way of summary judgment are largely inappropriate. And so there's just a lot of fact issues around the questions of whether they intended to commit fraud. You know, aside from their dealings with the plaintiffs, and aside from the evidence of their intent, they did things suggesting that they intended for Sainth to own the hotel. Sainth entered into a franchise agreement with Baymont Hotels to run the hotel, and they registered the vehicles for the hotel and the insurance in the name of Sainth. And they used the proceeds from Sainth's bank account for the sole and exclusive benefit of the hotel. And including paying the mortgage. No, including paying the mortgage. Correct. Which was going to be transferred to Sainth once the operating agreement was signed. So there are numerous fact questions surrounding whether the Carsons committed fraud, and then the piercing under the traditional factors is also an error. As an initial matter, the LLC statute itself says that the way of determining that a member is going to be liable for the debts of an LLC is to be determined solely and exclusively by the provisions of the LLC statute, suggesting that jurisprudential piercing that was used in the corporate context wouldn't apply to LLCs, and several courts have only analyzed bail piercing under the LLC statute after OGEA v. Merrick. Let me ask you this. The district court also found that the plaintiffs, when they sold this security through a misrepresentation, violated Louisiana Statute 51-712, the securities law. Why wouldn't that impose liability on the sellers who are the defendants in the case? 714. You're talking about in a prior judgment? No, no, right now. I mean, the judge found that the defendants had violated that statute, that they had sold the security through a misrepresentation, and so he found a violation of 712, and 714 imposes liability on the seller who is the defendant, as I understand it. Yes, Your Honor, that was the first claim that I was addressing originally, but my light went off, and I briefly answered. No, but I mean, why do you need to go through the piercing of the bail and all that if violation of the security statute imposes personal liability on the defendant? I think it's just kind of a belt and suspenders thing from the plaintiff's perspective, but we're here contending that both findings were in error, the finding of Louisiana securities law and the finding of piercing. So, I mean, you agree that if the finding of a violation of the securities law is upheld, then that would impose liability on the sellers of the security? As it stands now, the Carsons have been found liable under Louisiana securities law, separate and apart from the piercing claim entirely. Thank you very much. Okay, Mr. Brown. Would you talk about that last point first? Yes. The district court did, one basis for liability was a violation of 51712, and 714 imposes liability on the seller when they violate section 712. And there's no question that the representations and the statements that were made and everything that was done in connection with the sale of this was made by the Carsons personally, and therefore, absolutely, that would be a ground for them to be personally liable for these statements. So, why did we need to get into piercing of the bail or subsection D of the LLC law? Well, because there's an appeal of both of those decisions. You're arguing the issues that were presented, huh? That's right. And I think it's important just to get a full flavor in this case. We never know for sure which argument is going to work. So, we made two arguments, and they both got us what we wanted. So, that's why we made them both. I'm sorry, Your Honor. To answer one of the other questions that you had asked my opponent, in the previous decision, the panel of this court held, and this is from 784, 756F884, rather, the court held that Sainth was obligated to return the money it had received because there had been a failure of consideration, and that KAP was liable for the return of the funds because it had been unjustly enriched. So, both LLC entities are liable under the court's prior judgment. And the reason I mention that, it sort of segues into the piercing of the veil issue because we're looking at the Carsons having Sainth and KAP. If we pierce either one of those veils, then we're good. And the district court looked at this situation. Judge Drell analyzed it. I don't need to read to you what he concluded in this decision because I know you've read it. But the bottom line is, there are a lot of facts that support summary judgment, and despite the continuous reference to all of these facts that go against summary judgment, there aren't any in the record. The only fact that was ever mentioned was the finding that this court made, which I think has to be read in context. This court did say that the Carsons and the investors intended for Sainth to own the hotel. They did say that in this prior decision. But I think what they meant was, the paperwork and everything that was drawn up said that the investors would own Sainth, and Sainth would own the hotel. That's what that meant. That's the only actual fact that's ever referenced in any of their briefs. Some of the other facts that they don't... They had facts suggesting they'd asked their bank about transferring. That's true. You're right. My mistake. So, they did ask their bank about that. So, I mean, maybe the record's very open to the interpretation that the jury could find that they made a material representation that they would own it at the time of the presentation. But tell me again why a jury had to find that, if there were sort of little bits and pieces here and there that they intended to transfer. All right. And now we're talking about the securities law claim. Yes. Okay. Which gets back to my answer to you of why we went with two claims. Because I think the piercing of the veil is indisputable. On the securities claim, all of the evidence taken as a whole, and Judge Drell specifically addressed this, because there's one way to go on this, which is you just look at that one statement at that point. And at that point, these individuals are making a misstatement or they're not. Or you look at the overall course of conduct and you apply the analysis that Judge Drell did, which is basically, you know, to quote Aesop, you know, the proof is, you know, in the pudding. It's what you ultimately do that shows what you intended, you know, or by your fruits, you know, we'll know you or whatever. That thought that he looked at all of the evidence and that's what he said in his decision. And based on his review of that evidence, there's no reasonable way for him to conclude that they really intended to do this. Because there were so many opportunities for it to happen and it never happened. So he concluded that they didn't intend from the outset to actually transfer this. But having said that, let me go back to the piercing of the veil, because I think both of these theories are valid. But the piercing of the veil is just, there's nothing to dispute that the veil, for example, of KAP shouldn't be pierced. There's a statement by Mrs. Carson in her deposition. She was asked if KAP's funds and the Carsons' personal funds were, quote, interchangeable for all purposes, close quote. She said yes. The financial statements and the tax returns that were prepared by the Carsons, yes, they were prepared to reflect that Sameth owned the hotel. And yes, there were some inquiries made about Sameth being able to do things. But it never happened. And the effect of those statements and those inquiries and those tax returns was actually to continue the deception. Because the investors were getting these papers that said Sameth had this and Sameth had that, and it really didn't. So actually, those statements weren't to prove their intent. Those statements were to keep the investors from finding out for over a year that Sameth didn't own anything. And when they were invited finally to the grand opening of the hotel, of course, it didn't say a word. This is in the record. It didn't say a word about who actually owned the hotel. It wasn't until a year after the offering that they finally discovered it. And when the investors eventually discovered, this again is in the record, that Sameth did not own the hotel, the Carsons said, oh, it's your fault. You wouldn't agree to these other terms in this agreement. So we never could get it off the ground. Well, that just doesn't hold water. Nothing precluded a transfer of the hotel to Sameth. The Carsons just chose not to transfer it. And once again, Mrs. Carson in her deposition forthrightly said the reason, and this is one of the other elements in the record, it's a docket number 116. It was sealed, so it's not numbered as part of the record. But 67 or 68 of her deposition, she said that they didn't want to transfer the hotel that had been promised because it just wasn't in the Carsons' best interest, and those are her words, to do so. So the point is there are two ways to look at this case. One is you look at the overall conduct and you conclude, you know, actions speak louder than words. And what they always meant was what they did. And that's what Judge Drell concluded on the securities issue. The other way to look at it is you've got KAP, you've got Sameth, both completely liable to give this $3.5 million back to our clients. And there's no question that KAP was not a separate entity. Piercing of the veil under the factors in OJIA is completely appropriate under these circumstances. Judge Drell went through all of those factors. But when you have one of the members and managers of that company, yes, KAP's funds are interchangeable for all purposes with our personal funds. Or saying, oh, we just didn't make the transfer for KAP because it wasn't in our best interest to do so. You have a clear picture of a situation where, even though piercing may not be normal and it's not the typical thing to do, you have individuals driving the bus here for their own personal benefit and piercing was completely appropriate, as Judge Drell reasoned. Let me get back to the violation of 517.12, which makes it unlawful for any person to offer to sell a security by means of an oral or written untrue statement of a material fact, the buyer not knowing of the untruth. Now, the untrue statement was that the investors would be members of a limited liability company that would own the hotel. Yes, Your Honor. And then I assume that the letters, which is the evidence of their ownership, I assume you rely on that in connection with the statement. Yes. And what else do you rely on for the untrue statement? Well, ultimately, I mean, Judge Drell's decision sets forth exactly the reasons that we have, which is that when you look at the evidence and the facts and what actually occurred, there's really no genuine dispute of material fact that the Carsons intended to gain an unjust advantage for themselves. The statement, though, what other statements were made that . . . Well, there's another aspect to that. There's not only the original statement, but there's the ongoing, continuing misrepresentation. And it becomes clearer and clearer as we look back that the hotel was never going to be transferred. And the Carsons continue to create documents with Sainath and various things to make it look like Sainath is the owner and it's not, and continue to deceive the investors so they don't even know about it. Well, let's put it another way, though, and say that this just shows that they intended that Sainath would be the owner of the hotel. You say they're doing it to cover up the fact that it's not already the owner of the hotel. Well . . . I mean, you basically have those . . . you have the statement at the presentation and then you have the letters and then the fact that it took, well, two years from the time of the presentation to actually transfer the hotel, or to offer to transfer the hotel. Well, and I guess here's how I would analyze that. The argument that was made on this securities issue was that, well, this is a forward-looking statement. We didn't know what was going to happen in the future and we meant for this to happen. Well, that works fine. Let's say the hotel hadn't been transferred. Let's say we had a little different facts and the hotel was out there and it was available and then something fell through. Okay. If that wasn't the Carson's fault or for whatever reason, fine. That's the kind of thing where you look at the forward-looking statement and you say, well, something went wrong. Things go wrong. You said this was going to happen, but obviously, you know, you weren't lying to anybody because it wasn't your fault. Well, none of what happened in this case fits that description. These are the kinds of statements where the Carson's had complete control over what happened. There's no reason that the hotel couldn't have been transferred to Sada, except that the Carson's didn't do it. What do you say to their interpretation of would-be members of an LLC that sometime in the future, the hotel would be transferred to this LLC that they had an interest in? Well, I think the only reasonable inference that you can draw from the facts, and this is what Judge Drell concluded, is that that's just bunk because it never happened. There was no reason for it not to happen. And so when they said it, they didn't really mean it and it never happened. And that's what proves they're in town. Now, going back to the belt or the suspenders, whichever one it was, the piercing of the bail claim is extremely clear. It's extremely clear that KAP was just their own personal company and that the bail needs to be pierced there. It's extremely clear that this whole arrangement wasn't documented. They didn't have regular meetings. They didn't do any of the things they were supposed to do. And that the Carson's felt like KAP was their own personal piggy bank. And KAP certainly is liable for the full amount of this judgment. So on both of those grounds, we believe Judge Drell ruled correctly. I think actually the securities law issues are more complex. And the straightest path to upholding Judge Drell's decision is to recognize that based on all of the evidence, and there's no dispute. The only dispute is, oh, well, maybe we were going to transfer the hotel. There's no dispute that KAP's bail should be pierced based on the records. There's no dispute that the Carson's used this to gain benefit for themselves. There's no dispute that the investors ended up with nothing at the end of the day. So you're trying to get a judgment against KAP as well as the Carson's? No. KAP already has a judgment against this. My point is that since KAP is fully liable and the Carson's are KAP, then the judgment against KAP should be a judgment against the Carson's. What you're after today is affirming the personal judgment against the Carson's. I'm sorry, Your Honor. What you're after today is affirming the judge's finding that the Carson's are liable personally. Absolutely. And I believe that in the end, whatever issues there may be on this point or that point, he made the right decision. And the facts really speak for themselves. The actions of the Carson's absolutely show. And their statements about how these companies were KAP, at least, and their funds were personally interchangeable, and that they didn't do things to help Sainth because it wasn't, in quote, their best interest and they're the ones running the company. Those are the kinds of things that show that absolutely the veil was properly pierced by Judge Drell. And all of these facts that are constantly being referred to that support the opposite conclusion, what are they? There's only one issue here, which is, well, we made some more paperwork that talked about how maybe Sainth would get the hotel. Well, it's pretty clear that a lot of that paperwork wasn't even true at the time it was generated. The tax returns and things that showed Sainth was the owner that were given to the investors were actually just part of the scheme to mislead the investors. You know, the plans don't exactly get an A for their due diligence either, do they? Well, I think the answer to that, I agree with you. And I think my opponent answered that. These are the colleagues of Dr. Carson. And he brings in his fellow doctors into this meeting and they trust him. So I agree. Maybe more due diligence would have been appropriate. But under these circumstances, there's no reasonable, in this context, basis for them to know that these statements were false. They trusted him. They believed him. The Carsons went out of their way to continue for some time to generate paperwork that made it look like Sainth was going to own the hotel when it didn't. So you're right. They could have been more careful. But on the other hand, I don't think that they were unreasonable in trusting their colleague, especially when they were continuously bombarded with misleading information. That's all I have. Thank you very much. Okay, Mr. McArdle, back to you. Thank you, Your Honors. To address a couple of points. First of all, back to the Louisiana securities law claim. I mean, it just remains that there are a number of fact issues surrounding the issue of whether they knew or should have known that they were making a material misrepresentation on November 22nd, 2006. The securities laws are such that you have to consider whether it was a misrepresentation at that time, not whether they should have done something later. After they purchase the securities, conduct that takes place after the purchase or sale of securities does not go into the securities claim. The law is clear. You can look at conduct after the representation to determine that what it would. Sure. No, I agree. They knew it was false or not. Right. It uses circumstantial evidence as to what was happening at the time. But they're talking about different conduct that took place later that amounts to fraud and suggesting that that, you know, constitutes a violation of Louisiana securities law. Now, while it is correct that there is no scienter element of Louisiana securities law, they still have to prove that the Carsons knew or should have known that they were making a material misrepresentation at the time. And there are a lot of fact questions in this record about whether that happened. And there's certainly enough to preclude an award of summary judgment and certainly enough that a jury could conclude that fact in the Carson's favor. Well, they knew the hotel title was not in the LLC that these plaintiffs bought an interest in. They knew at the time of the offering, again, everybody knew that it wasn't going to be purchased by St. Nath. It hadn't been formed yet. They hadn't invested yet. The idea was at the time of the offering, if you guys invest, reforming this new LLC, we're going to transfer it over. And they knew that there was going to be debt on the hotel as well. Now, I'm sure that if Ms. Carson was here and even Dr. Carson was testifying, they could explain a lot about the who, what, when, where, why, and who knew what and what were, what was the total mix of information available at the time, and why they did certain things, and why this took this long, and why this took long, and why didn't you do this? I mean, these are all fact questions. And to determine that in a way of summary judgment, why don't we just freeze frame it at the moment of that presentation? They own CAP, right? They have the purchase agreement for it. Yes. And they have complete control of that. And there is no document existing at that time that shows any plan or mechanism to transfer it. Yet they say, you will own it. That's correct. There was no document in place yet. But it was, I mean, the fact remains, if the hotel would have been- And in their mind that- Right. And they told that to the plaintiffs. But I mean, it's hard to miss this. But if the hotel would- The record reflects they told the plaintiffs, we own the entity that has the purchase agreement. We have no existing plan or mechanism to give it to you. But you will own it. They disclosed that. No, I don't think that that is clear in the record that it says exactly what Your Honor said. But they did say that by investing this LLC, we're going to transfer the hotel over to it. Right. This LLC. Into the new LLC, yes. And really, the truth is that had the hotel been transferred in January, in the summer, in that meeting in July 2008, the financial position of the plaintiffs would have been exactly the same. And through that time, they were sharing in the loss of the hotel through that time. And were it to transfer over, it would have just been a mere paperwork. It was just paperwork to transfer the hotel over. The financial situation was the same. They weren't depriving the plaintiffs of any benefits of the ownership of the hotel or the running of the hotel through that time. And if I could just address the piercing claim for a second. It's important to understand that the piercing claim, they're asking, well, let me say one thing first. That the piercing claim on appeal is piercing as to saneth, not as to cap. And so I don't think that the district court made any findings that the Carsons are liable for the debts of cap or that that has been properly brought before appeal. But as to saneth, the district court found that the misconduct was fraud that occurred on November 22, 2006, before the LLC was formed. And as they point out, a member of an LLC can't claim the protections of an LLC for conduct taken before the LLC was formed. And I agree with that. But by the same token, the plaintiffs can't use the exceptions in an LLC statute to try to hold the Carsons liable for the debts of saneth for conduct taken before the LLC was formed. The plaintiffs had a number of claims against the Carsons directly. Fraud, intentional and negligent misrepresentation, and conversion. They voluntarily dismissed those claims to avoid a trial that had been set by the court in April of 2015. And those claims were dismissed with prejudice in March of 2015. And so it wouldn't be proper for them to resurrect those claims on appeal. Your Honor, I'm out of time. We respectfully request that you reverse the summary judgment. Thank you. Thank you.